UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOSEPH MICHAEL MCINTYRE,

                Petitioner,              Case No. 1:17-cv-764

v.                                    Honorable Robert J. Jonker

SHERRY L. BURT,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Joseph Michael McIntyre is incarcerated with the Michigan Department of Corrections at the Muskegon Correctional Facility (MCF) in Muskegon, Muskegon County, Michigan.  On November 10, 2011, following an eight-day jury trial in the Kent County Circuit Court, Petitioner was convicted of three counts of first-degree home invasion, in violation of Mich. Comp. Laws § 750.110a, seven counts of arson of a dwelling house, in violation of Mich. Comp. Laws § 750.72,[1] and one count of arson of a building in the curtilage of a dwelling house, in violation of Mich. Comp. Laws § 750.72.  On December 13, 2011, the court sentenced Petitioner to concurrent prison terms of 10 to 20 years for the home invasion convictions to be served consecutively to concurrent prison terms of 10 to 20 years for the arson convictions.  Petitioner's earliest release date is October 16, 2030; his maximum discharge date is October 16, 2050.  *See*  https:// mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=823709 (visited Feb. 13, 2021).

---

[1] At the end of 2012, Michigan amended the penal code chapter covering arson and burning crimes.  The burning crimes which Petitioner committed would now be prosecuted under the new statutory sections as second-degree arson. Mich. Comp. Laws § 750.73.

On August 18, 2017, Petitioner timely filed his habeas corpus petition[2] raising

seven grounds for relief, as follows:

I.       Petitioner's Fifth and Fourteenth Amendment rights to the United States Constitution were violated when his statement was used as evidence at his state court prosecution as (A) he did not waive his "*Miranda*" rights and (B) his statement was involuntary due to his mental illness.

II.      Petitioner's Sixth Amendment rights to the United States Constitution and guarantee[] to effective assistance of counsel were violated where counsel failed to object to the testimony of an ATF Agent who had been expert-qualified as to "fire setter behavior" to express his opinion as to the issue of insanity, an issue beyond the scope of the ATF Agent's expertise.

III.     Petitioner's Fourteenth Amendment rights to the United States Constitution and due process were violated when the prosecutor during closing argument told the jury the effect of a "not guilty by reason of insanity verdict" would result in Petitioner escaping punishment or "skating," denigrating the insanity defense and in comparing Petitioner to child pornographers and sexual deviates.

IV.     Petitioner's Fourteenth Amendment rights to the United States Constitution and due process were violated when the prosecutor during opening argument made a "civic duty" argument by telling the jury to convict for [a] reason other than the issue at trial.

V.      Petitioner's Sixth Amendment rights to the United States Constitution were violated where the tr[ia]l court used the sentencing guidelines in judicial fact-finding and used judicial fact-finding in scoring the sentencing guidelines, facts which were not found by the jury and increased Petitioner's mandatory minimum sentence.

VI.     Petitioner's Sixth Amendment rights to the United State[s] Constitution and guarantee to effective assistance of counsel was violated where tr[ia]l counsel failed to object to the prosecutor's opening argument.

---

[2] The petition is subject to a one-year period of limitation; the period begins to run when the judgment of conviction is final. 28 U.S.C. § 2244(d)(1). That occurs after the Supreme Court denies a petition for writ of certiorari, or when the time to file such a petition expires—90 days after the Michigan Supreme Court resolves Petitioner's case by decision or by denying an application for leave to appeal. 28 U.S.C. § 2244(d)(1)(A). The period is tolled while a properly filed collateral challenge such as a motion for relief from judgment under Michigan Court Rule 6.500 et seq. is pending. 28 U.S.C. § 2244(d)(2). As set forth fully below, Petitioner filed such a motion one year and 90 days after the Michigan Supreme Court denied leave to appeal on Petitioner's direct appeal, the very last day in Petitioner's period of limitation. Thereafter, however, and through the date Petitioner filed his petition in this court, his collateral challenge was pending. Therefore, his petition is timely.

VII.    Petitioner's Sixth Amendment rights to the United States Constitution and guarantee to effective assistance of counsel was violated where counsel on appeal failed to raise material issues on Petitioner's appeal of right.

(Pet., ECF No. 1, PageID.20–31.)  Respondent has filed an answer to the petition (ECF No. 15) stating that the grounds should be denied because they are not cognizable on habeas review or are without merit.  Petitioner has replied to the answer.  (ECF No. 20.)  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

## I.    Factual allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

Eleven fires occurred in Grand Rapids, mostly on the southeast side of town and in garages, between July 18, 2010, and October 17, 2010.  A task force was created to apprehend the arsonist.  Shortly after its creation, the task force received an anonymous tip that defendant was the arsonist.  After receiving the tip, task force members interviewed friends and members of defendant's family and then placed him under surveillance.  In the early morning hours of October 17, 2010, task force members watched as defendant left his house and followed him to a home on 32nd Street in Grand Rapids.  After defendant drove from the location, police officers moved in to the location and discovered a fire which had been set in an undetached garage.  Defendant was stopped a short time later and taken into custody.  He confessed to setting the fires, except for two of them, but claimed that he was insane at the time of the fires.

(Mich. Ct. App. Op., ECF No. 16-19, PageID.1195.)  "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016).  Petitioner's habeas challenges do not call into question the facts recited by the state appellate court.

The underlying facts regarding the fires are not the focus for Petitioner's post-judgment challenges for two reasons:  first, he confessed to setting most of the fires during his

video-recorded police interview; and second, his principal defense was that he was not guilty because he was insane at the time of the fires.  The jurors deliberated for less than three hours before reaching their verdict, rejecting Petitioner's principal defense.

The trial court sentenced Petitioner as described above.  The court's scoring of the Prior Record Variables and Offense Variables is conveniently spelled out in the transcript of the sentencing hearing.  One of Petitioner's habeas grounds centers on the court's scoring of the guidelines.  Petitioner complains that the court relied on "judge-found" facts—facts beyond those found by the jury in connection with the determination of Petitioner's guilty or otherwise admitted by the Petitioner—to determine Petitioner's guidelines score.  That complaint is accurate; however, the court did not sentence Petitioner in the guidelines range that followed from the score so determined.  Instead, with regard to each of Petitioner's sentences, the court departed upward.

Petitioner appealed his convictions and sentences to the Michigan Court of Appeals.  By way of the briefs he filed with the assistance of counsel and a *pro per* supplemental brief, Petitioner raised several issues, including the issues raised in habeas grounds I, II, and III. By opinion issued February 18, 2014, the Michigan Court of Appeals rejected Petitioner's challenges with one exception.  The court agreed that the evidence was not sufficient to support the first-degree home invasion conviction with regard to one of the fires because the garage where the fire was set—2618 Ridgecroft Drive—was not appurtenant to the condominium unit where the homeowner was present—2620 Ridgecroft Drive—such that the "presence" of the homeowner in 2620 did not render the entry into the garage at 2618 first-degree home invasion.  (Mich. Ct. App. Op., ECF No. 16-19, PageID.1203–1204.)  The court of appeals vacated that conviction and sentence.  The trial court promptly entered an amended judgment of sentence.  (Kent Cnty. Cir. Ct. Docket Sheet, ECF No. 16-2, PageID.249.)

Petitioner, with the assistance of counsel, filed an application for leave to appeal to the Michigan Supreme Court, raising the same issues he had raised in the court of appeals, with two exceptions: the issue that he prevailed on in the court of appeals and an issue regarding warrantless GPS tracking of the vehicle he used, which was proven inaccurate when the warrant was submitted to the court of appeals.  By order entered September 5, 2014, the Michigan Supreme Court denied leave to appeal.  (Mich. Order, ECF No. 16-20, PageID.1418.)

One year and ninety days later, Petitioner filed a motion for relief from judgment in the trial court raising several issues, including the issues he raises in habeas grounds IV, V, VI, and VII.  By order entered January 11, 2016, the trial court rejected Petitioner's claims.  Petitioner sought leave to appeal in the Michigan Court of Appeals and the Michigan Supreme Court.  Those courts denied leave by orders entered September 12, 2016, and June 27, 2017, respectively (Mich. Ct. App. Order, ECF No. 16-23, PageID.1540; Mich. Order, ECF No. 16-24, PageID.1625.) Petitioner filed a timely motion for reconsideration in the Michigan Supreme Court.  While that motion was pending, he filed his habeas petition in this Court.  By order entered September 12, 2017, the Michigan Supreme Court denied the motion for reconsideration.  (Mich. Order, ECF No. 16-24, PageID.1682.)

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d)"—

for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id*. citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

### A.    Use of Petitioner's confession (habeas ground I)

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  In *Miranda v. Arizona*, 384 U.S. 436 (1966) (internal quotes omitted), the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self-incrimination, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel.  *Id.* at 478–79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994).  Even so, "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good . . . . Admissions of guilt resulting from valid *Miranda* waivers are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Texas v. Cobb*, 532 U.S. 162, 172 (2001) (quotation and citation omitted).

When a criminal defendant claims that his confession was rendered involuntary by police coercion, the court must inquire whether, considering the totality of the circumstances, the conduct of law enforcement officials overbore the will of the accused.  *See Mincey v. Arizona*, 437 U.S. 385 (1978); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973).  A suspect's state of mind, standing alone, cannot render a statement involuntary.  Rather, coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession.  *See Colorado v. Connelly*, 479 U.S. 157, 163–67 (1986).

Typically, findings of coercive police conduct involve brutality or threats of physical coercion. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991) (threats of physical violence); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant interrogated for eighteen hours without food or sleep while on medication); *Beecher v. Alabama*, 389 U.S. 35 (1967) (gun held to head of wounded suspect to extract confession); *Cooper v. Scroggy*, 845 F.2d 1385 (6th Cir. 1988) (officer struck defendant, failed to take steps to change coercive environment, and other detective threatened defendant). Nevertheless, a confession may be rendered involuntary if it is the product of psychological pressure or coercion sufficient to overbear the will of the accused. *See Fulminante*, 499 U.S. at 287–88. Among the circumstances to be reviewed by the habeas court are "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition and mental health." *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (citations omitted).

Although a detained person has the right to remain silent, he or she is not required to do so. In choosing to speak, however, the person is choosing to waive the *Miranda* rights. The waiver of *Miranda* rights must be done knowingly, voluntarily, and intelligently. *Miranda*, 384 U.S. at 444. The inquiry "has two distinct dimensions." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). First, the waiver must have been the product of a free and deliberate choice, without coercion, intimidation, or deception. *Moran*, 475 U.S. at 421. Second, the waiver must have been made with a full awareness of the right being abandoned and the consequences of the decision to abandon the right. *Id.* An individual need not know every possible consequence of a waiver, however. *Spring*, 479 U.S. at 574. Instead, the requisite inquiry is whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.*

Petitioner discusses two distinct, but closely related, challenges to the admission of a video recording of his police interview at trial:  first, he contends he never expressly waived his right to remain silent; and second, he claims that his mental illness rendered any confession involuntary and unknowing.  It is undisputed the Petitioner did not expressly waive his *Miranda* rights.  At the suppression hearing, the prosecutor reviewed the content of the recorded interview with ATF agent, and principal interviewer, Michael Marquardt.  Agent Marquardt read Petitioner his rights, and after each, Petitioner indicated his understanding with a nod or a verbal "yes." (Mot. Hr'g Tr., ECF No. 16-9, PageID.308.)  After the reading of the rights, however, Petitioner never expressly stated that he agreed to talk or that he waived with rights.  (*Id*.)  But he also never indicated any reluctance or hesitance to talk, nor did he request an attorney.  Instead, he spoke freely and in some detail regarding the fires he was accused of setting.  The interview continued for almost 4 hours.

The fact that Petitioner never expressly waived his rights does not resolve the matter.  "The prosecution . . . does not need to show that a waiver of *Miranda* rights was express[; a]n 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (holding that courts can infer a waiver of *Miranda* rights "from the actions and words of the person interrogated")).

The trial court expressly relied on *Berghuis*, 560 U.S. 370, and concluded Petitioner had implicitly waived his rights:

> So, essentially what the [*Berghuis*] court is saying is that the defendant must be advised of his rights and there must be a showing that he understood those rights and that the subsequent statement by the defendant was uncoerced.  If those showing are made, even in in the absence of an affirmative waiver, then any statement which is taken following the administering of those warnings is admissible . . . .

> In the case at bar, we have the transcript with the indication of the rights being administered orally, and I think the parties are in agreement that the rights are properly set forth. . . . [H]ere it seems quite clear, both from the written transcript and the video of the statement, that each right was painstakingly gone over with the defendant . . . . So it seems clear from the context that the defendant understood each right and expressed an understanding of it . . . . Then we have a very lengthy statement . . . .
>
> There is no hint of coercion in the course of the statement. The investigators appeared to have conducted themselves with full professionalism and propriety. There is not any hint or indication of undue influence or coercion or anything of the sort. And there is no indication anywhere of involuntariness in any of the statements made by the defendant. Moreover, there is no indication anywhere that the defendant wanted to discontinue questioning, or wanted to remain silent or in any way wanted to assert his right to remain silent. And the burden, I suppose, in the *Berghuis v. Thompkins* case is that assuming the rights have been administered and they've been understood and there's no coercion, it essentially becomes incumbent upon the accused wishing to assert his right to remain silent, to actually do so in some fashion . . . .
>
> Since there is nothing of that sort and there is  no other indication of coercion or involuntariness, it seems obvious that the statement is uncoerced and is totally voluntarily provided.

(Mot. Hr'g Tr., ECF No. 16-9, 311–312.)  The Michigan Court of Appeals agreed "with the trial court's application of *Berghuis* to [Petitioner's] case."  (Mich. Ct. App. Op., ECF No. 16-19, PageID.1199.)

Petitioner contends that the state courts' applications of *Berghuis* were unreasonable.  He relies heavily on the following language quoted in *Berghuis*, but taken from *Miranda*:

> *Miranda* said "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."  384 U.S., at 475; *see id*., at 470 ("No effective waiver . . . can be recognized unless specifically made after the [*Miranda*] warnings . . . have been given").  In addition, the *Miranda* Court stated that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  *Id*., at 475.

*Berghuis*, 560 U.S. at 383.  Petitioner presents that language as if it were the crux of the *Berghuis* decision and the key instruction to be taken from *Miranda* regarding waiver.  That is a gross misreading of *Berghuis*.

The *Berghuis* Court offered the language quoted above as "[s]ome language in *Miranda* [that] could be read to indicate that waivers are difficult to establish absent an explicit written waiver or a formal, express oral statement."  *Id*.  The Court went on to point out that although the *Miranda* language ***could*** be read that way, that subsequent decisions demonstrate the contrary—that waivers "can be established even absent formal or express statements of waiver . . . ."  *Id*.  When the *Berghuis* Court quoted the restrictive language from *Miranda* on which Petitioner relies, the Court was expressly rejecting that restrictive reading as an accurate reflection of the law.

So if the restrictive language from *Miranda* does not accurately reflect the law of implied waiver, what is the law?  *Berghuis* stated the law as follows:

> The prosecution therefore does not need to show that a waiver of *Miranda* rights was express.  An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence.  *Butler, supra*, at 376.  *Butler* made clear that a waiver of *Miranda* rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver."  441 U.S., at 373.  The Court in *Butler* therefore "retreated" from the "language and tenor of the *Miranda* opinion," which "suggested that the Court would require that a waiver . . . be 'specifically made.'"  *Connecticut v. Barrett,* 479 U.S. 523, 531–532 (1987) (Brennan, J., concurring in judgment).

> If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a valid waiver" of *Miranda* rights.  *Miranda*, supra, at 475.  The prosecution must make the additional showing that the accused understood these rights.  *See Colorado v. Spring*, 479 U.S. 564, 573–575 (1987); *Barrett, supra*, at 530; *Burbine*, 475 U.S., at 421–422.  *Cf. Tague v. Louisiana*, 444 U.S. 469, 469, 471 (1980) (per curiam) (no evidence that accused understood his *Miranda* rights); *Carnley v. Cochran*, 369 U.S. 506, 516 (1962) (government could not show that accused "understandingly" waived his right to counsel in light of "silent record").  Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

12

*Berghuis*, 560 U.S. at 384.  That is precisely the analysis employed by the trial court in rejecting Petitioner's motion to suppress the statement:  "the rights [were] administered orally. . . , the rights are properly set forth . . . ,  the defendant understood each right and expressed an understanding of it . . . , [t]hen [he made] a very lengthy statement . . . , [and] there [was] no hint of coercion in the course of the statement."  (Mot. Hr'g Tr., ECF No. 16-9, 311–312.)  That is in no way an unreasonable application of *Berghuis* and it is not contrary to *Berghuis* or any other clearly established federal law.

Petitioner attacks the trial court's conclusion that the statement was not coerced by declaring there was significant evidence at trial that Petitioner suffered from a mental illness.  As noted above, the court must consider the totality of the circumstances when assessing a claim of coercion, including  "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition and mental health."  *Withrow*, 507 U.S. at 693–94 (citations omitted).  But the fact that mental health is relevant does not mean that the presence of mental illness is dispositive.  Indeed, clearly established federal law says the opposite: "a defendant's mental condition, by itself and apart from its relation to official coercion . . . [does not] dispose of the inquiry into constitutional 'voluntariness.'"  *Connelly*, 479 U.S. at 164.

Petitioner presented no evidence to the state courts, and now no evidence to this Court, that would tend to show that, because of mental illness, he did not have the capacity to waive his *Miranda* rights or that his statement was the product of police coercion.  Petitioner's declaration of mental illness standing alone is not enough.  Accordingly, Petitioner has failed to show that the state court's determination that his confession was not coerced—and that his waiver of the right to remain silent was voluntary and knowing—was contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief under the

deferential standard of § 2254(d). Moreover, Petitioner is not entitled to habeas relief if, as Petitioner urges, the Court reviews the voluntariness and waiver issues *de novo*.

**B.    Trial counsel's failure to object to improper expert testimony (habeas ground II)**

Petitioner next complains that ATF Agent Kevin Kelm, who was qualified to offer expert testimony regarding "fire-setter behavior" but then, according to Petitioner, expressed expert opinion regarding Petitioner's sanity and "gave extensive testimony concerning serial arsonists or fire-setters as whether [they are] insane or not . . . ." (Pet., ECF No. 1, PageID.23.) Petitioner contends that Agent Kelm's testimony regarding fire-setter sanity was not appropriate under Michigan Rule of Evidence 702 and that counsel was ineffective for failing to object. The Michigan Court of Appeals determined that Petitioner, by virtue of counsel's failure to object to the testimony, had waived the claim regarding the propriety of Kelm's testimony. For that reason, Petitioner contends his counsel rendered constitutionally ineffective assistance because he failed to object.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide

range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The court of appeals considered Petitioner's ineffective assistance of counsel under the *Strickland* standard, or at least the functional equivalent of that standard:

> To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonable and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008).

(Mich. Ct. App. Op., ECF No. 16-19, PageID.1207.) The state court cited state authority for the standard, but the standard was ultimately derived from *Strickland. People v. Uphaus*, 748 N.W. 2d 899, 906 (Mich. Ct. App. 2008) (citing *People v. Toma*, 613 N.W.2d 694, 703 (Mich. 2000) (citing *Strickland*)). Thus, it cannot be said that the court of appeals applied the wrong standard, leaving only the AEDPA question regarding the reasonableness of the court's application of the standard.

The court of appeals reviewed Petitioner's underlying claim that Kelm's testimony was inadmissible under Michigan Rule of Evidence 702—the objection counsel failed to raise— and concluded that the claim had no merit. (Mich. Ct. App. Op., ECF No. 16-19, PageID.1205) ("Defendant claims that there was no showing that Kelm was qualified to testify about arsonist behavior. . . . [T]here is no merit to defendant's claim. . . . There is also no merit to defendant's claim that Kelm's testimony was inadmissible under MRE 702 . . . ."). That determination conclusively resolves the merit of the admissibility of Kelm's testimony under state law.

As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal

habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68.  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)); *see also Thomas v. Stephenson*, 898 F.3d 693, 700 n.1 (6th Cir. 2018) (same).  Therefore, this Court is bound by the Michigan Court of Appeals' application of Mich. R. Evid. 702.

The court of appeals went on to conclude that because Petitioner's proposed challenge to Kelm's testimony had no merit, "the proffered objections to Kelm's testimony would have been futile."  (Mich. Ct. App. Op., ECF No. 16-19, PageID.1207.)  And "[c]ounsel is not ineffective for failing to make a futile motion or objection."  (*Id.*)

When a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 562 U.S. at 105; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Counsel's failure to raise a meritless issue does not constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010).  "Omitting meritless arguments is neither professionally unreasonable nor prejudicial."  *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).  Therefore, Petitioner has failed to demonstrate that the court of appeals'

rejection of his ineffective assistance claim relating to counsel's failure to object to Kelm's testimony is contrary to, or an unreasonable application of, clearly established federal law, and he is not entitled to habeas relief on that claim.

### C.    Improper closing argument (habeas ground III)

Petitioner also contends that the prosecutor violated his due process rights during closing arguments in two ways: first, by denigrating the insanity defense—suggesting that a "not guilty by reason of insanity" verdict would permit Petitioner to escape punishment; and second, by inciting the passions and prejudices of the jury—comparing Petitioner to sexual deviates and child pornographers.  (Pet., ECF No. 1, PageID.24.)  Petitioner identifies the following arguments as arguments that denigrate his insanity defense:

> The People have proven beyond a reasonable doubt that he is guilty of all the arsons, all the arsons of dwelling curtilage and home invasions.  So, I'm not going to waste your time.

> I'm going to go right to what the issue is and you know what the issue is.  And really the only issue is, in this case, is the defendant legally insane, right?  I mean, that's really what you're going to spend, I would expect, the overall majority of your time talking about.  However long that is.  And that's up to you.  Until you're satisfied, each and every one of you is satisfied, that the evidence and the law answers that question.

> Legal insanity, you've heard through the course of this and it's in the instruction, it's part of the law.  It's a two-prong test.  And you know that, you've heard that, right?  First, the defense has to prove, not the people—I have to prove he committed the crimes, and if you believe he committed the crimes beyond a reasonable doubt then you have to find him guilty under the law.  That's your duty.

> ***The only way he skates on this, gets off of this, is if the defense has proven its burden to prove by a preponderance that he is legally insane.***  That's their job, their proof issues.  They have to prove that.  And the law, this preponderance of the evidence?  I expect you get a definition of that from the judge, but what it really means is does the evidence that he's legally insane outweigh the evidence that he's not.  That's really it.  Is there more evidence, does it outweigh the evidence that he's not legally insane?  That's what the defense has to prove.  And this is the test.

*    *    *

This is a difficult burden.  Proving someone is legally insane is a difficult burden.
And it should be.  That's how it's designed under the law.  It's a very narrow
defense, ***because if he is found legally insane at the time of his offenses, it excuses
his crimes.  It excuses his crimes.  Because they're saying it really wasn't him,
he didn't really intend to do it, he really couldn't have possibly thought it out.
Finding someone legally insane means he's held not responsible.  Not
responsible for his actions.  That's what it's saying.  And his crimes go
unpunished.  That is the effect***.

\*       \*       \*

I mean, people aren't OCD, and that's a mental illness, and don't show it.  Right?
You can see it.  Evidence of it.  This should not be a guessing game for you, it
should be clear.  If he is mentally ill, as defined by the statute, it should be clear.  It
should be obvious.  Those are the people entitled to this defense.  ***Entitled to a
walk.  Treatment.  Not punishment.***  It ain't him.

(Trial Tr. VII, ECF No. 16-16, PageID.1013, 1015, 1024) (emphasis added).  It is the emphasized

sentences that Petitioner finds objectionable.  (Pet., ECF No. 1, PageID.25–26.)

And Petitioner identifies the following argument as inciting the passions and

prejudices of the jury against him:

That is not Joe McIntyre.  That is not the defendant.  He's not living in another
world, he's living in this world.  The same world you and I live in.  He just gets his
kicks in a different way.  And I'm not trying to be trite about it, I'm not trying to
be glib about it, but there are people, and you've heard of them, I've heard of them,
who get enjoyment out of things that you think are weird, right?  Or bizarre.

***People like feet, I hear.  You know?  Some people have a foot fetish.  Really?  Is
there anything much uglier than a foot?  But, you know, people get enjoyment
out of feet.  People get enjoyment out of pornography.  Some get enjoyment out
of kiddie porn.  Does that sound fun to you?  Does that sound enjoyable or
exciting to you?  Looking at little kids naked or doing stuff with each other?  It
does to some people.  It doesn't make them legally insane, it just means they're
different from you.  Weird?  Yeah. Different?  Yeah.  Odd?  You bet.  But it
doesn't make them legally insane.***

(Trial Tr. VII, ECF No. 16-16, PageID.1018–1019) (emphasis added).  It is the emphasized

paragraph that Petitioner finds objectionable.  (Pet., ECF No. 1, PageID.25–26.)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial

misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11–12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12–13; *Darden*, 477 U.S. at 181–82; *Donnelly*, 416 U.S. at 646–47; *Berger v. United States*, 295 U.S. 78, 84–85 (1935).  "[A] prosecutor's comments violate the defendant's right to due process only if, **in context**, they 'undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice.'" *Winowiecki v. Gidley*, No. 20-1461, 2020 WL 6743472, at *2 (6th Cir. Sept. 8, 2020) (quoting *Young*, 470 U.S. at 16) (emphasis added); *see also United States v. McQuarrie*, 817 F. App'x 63, 81 (6th Cir. 2020) ("[C]ontext is key . . . .").

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).  Indeed, "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the

state court's rejection of his prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. at 103).

The Michigan Court of Appeals applied the following standard to resolve Petitioner's challenge:

> The test for prosecutorial misconduct is whether the defendant was denied a fair and impartial trial.  *People v Mesik (On Reconsideration)*, 285 Mich App 535, 541; 775 NW2d 857 (2009).  Although a prosecutor "may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935).  We review claims of prosecutorial misconduct on a case-by-case basis, examining the prosecutor's challenged remarks in context.  *People v McLaughlin*, 258 Mich App 635, 644; 672 NW2d 860 (2003).

(Mich. Ct. App. Op., ECF No. 16-19, PageID.1207–1208.)  That standard is entirely consistent with the clearly established federal law cited above.  That leaves only the question of whether the appellate court's application of that law was reasonable.

The Michigan Court of Appeals separated Petitioner's arguments into two categories:  the arguments that told the jurors the consequence of finding Petitioner not guilty by reason of insanity—characterized by Petitioner and, therefore, the court of appeals as "civic duty" arguments[3]—and the arguments where the prosecutor compared Petitioner to child pornographers and sexual deviates.

---

[3] Petitioner raised these arguments on direct appeal as "classic 'civic duty to convict' argument[s]."  (Pet'r's Appeal Br., ECF No. 16-19, PageID.1257.)  In his habeas submissions, Petitioner does not characterize his habeas challenge to the prosecutor's closing arguments as a "civic duty" challenge.  (Pet., ECF No. 1, PageID.24–26; Pet'r's Response Br., ECF No. 20, PageID.1708–1717.)  The omission is noticeable because he very specifically challenges the prosecutor's opening presentation to the jurors as a "civic duty" argument.  (Pet., ECF No. 1, PageID.26–27; Pet'r's Response Br., ECF No. 20, PageID.1717–1719.)  As explained below, *see* § II.D., calling an argument a "civic duty" argument does not mean it is unconstitutional; the key is whether the argument, by purpose or effect, incited the passions or prejudices of the jury, drawing their attention to something outside the evidence presented at trial.  Petitioner's arguments in this Court are directed toward those key factors.  Nonetheless, because Petitioner

### 1.    The consequence of finding Petitioner is not guilty by reason of insanity

The appellate court resolved the first category as follows:

A prosecutor may not urge the jury to convict a defendant as part of its civic duty. *People v Bahoda*, 448 Mich 261, 283; 531 NW2d 659 (1995). A civic duty argument "unfairly places issues into the trial that are more comprehensive than a defendant's guilt or innocence and unfairly encourages jurors not to make reasoned judgments." *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003). A jury is not to be concerned with the consequences of its verdict. *People v Goad*, 421 Mich 20, 36; 364 NW2d 584 (1985). Thus, counsel should not address the question of the disposition of the defendant after the verdict. *Id*. at 25; *People v Torres*, 222 Mich App 411, 423; 564 NW2d 149 (1997). It is improper for a prosecutor to capitalize on a jury's fear that if a defendant is found insane that the defendant will be set free, *People v Staggs*, 85 Mich App 304, 310; 271 NW2d 211 (1978); *People v Lewis*, 37 Mich App 548, 552-553; 195 NW2d 30 (1972), and to disparage or denigrate the insanity defense, *People v Wallace*, 160 Mich App 1, 9; 408 NW2d 87 (1987).

We do not agree with defendant's assertion that the prosecutor's statements were virtually identical to the improper statements made by the prosecutor in *Hanna v Price*, 245 Fed Appx 538 (CA 6, 2007). Here, the prosecutor did not engage in any denigration or disparagement of the insanity defense. She did not state her personal beliefs about the defense, and she did not request the jurors to nullify the defense.

The prosecutor's statement that the only way defendant "skates on this, gets off of this" is if he proves by a preponderance of the evidence that he was insane did not constitute plain error. *Ackerman*, 257 Mich App at 448. Before making this statement, the prosecutor explained to the jury that, because defendant agreed that he set the charged fires and did not dispute the location of them, there was really no dispute that she had proved the elements of the charges beyond a reasonable doubt. While the prosecutor's statements are of concern to this Court, we cannot find, on an examination of the whole of her statements, that they constituted plain error.

The prosecutor's statement that, if a defendant is found insane, the defendant is not held responsible for his actions and his crimes are excused and go unpunished also did not constitute plain error. *Id*. When examined in context, *McLaughlin*, 258 Mich App at 644, the prosecutor's statement was part of an argument that the jury should not find defendant insane because it is obvious when a person has a mental illness, as the term is defined by statute, and it was not clear that defendant suffered from such an illness. Thus, although the jury may have learned through the prosecutor's statement that defendants who are found not guilty

---

characterized the arguments differently in the Michigan Court of Appeals, that court's resolution of the issue is focused on the arguments as "civic duty" arguments.

by reason of insanity either get released or treatment, the statement was not clearly and obviously a comment on defendant's potential disposition should he be found insane. *Carines*, 460 Mich at 763. Moreover, the statement cannot be viewed as an attempt to persuade the jury to decide defendant's guilt based on its fears and emotions. The argument, of which the statement was a part, actually asked the jury to decide defendant's guilt on the facts and law.

Additionally, the prosecutor's statement that "[t]hose" people, rather than defendant, are the ones entitled to the insanity defense and to a walk or treatment did not constitute plain error. *Ackerman*, 257 Mich App at 448. When examined in context, the statement was part of an argument that the jury should not find defendant insane because it is obvious when a person has a mental illness, as the term is defined by statute, and it was not clear that defendant suffered from such an illness. Thus, although the jury may have learned that defendants who are found insane either get released or treatment, the statement was not clearly and obviously a comment on defendant's potential disposition should he be found insane. *Carines*, 460 Mich at 763.

(Mich. Ct. App. Op., ECF No. 16-19, PageID.1208–1209.)

Although Petitioner called his argument a "civic duty" challenge in the state appellate court, his focus in this Court is a claim that the prosecutor's argument denigrated the insanity defense. One aspect of Petitioner's argument finds support in the caselaw: where prosecutorial misconduct has been found for denigrating the defense of insanity, the improper closing arguments typically disclose to the jurors that finding for the defendant on the insanity defense means he will go free. That element is certainly present in Petitioner's case.

A review of those cases, however, indicates that even if reporting the disposition is an element common to improper denigration of the defense, it does not appear to be sufficient, standing alone, to establish denigration. For example, in *Hanna v. Price*, 245 F. App'x 538 (6th Cir. 2007), a case relied upon heavily by Petitioner, the Court of Appeals upheld this Court's grant of habeas relief for denigrating the insanity defense. The court described the improper argument as follows:

Within a span of only a few sentences, the state prosecutor at Hanna's trial managed to express his personal beliefs about the defendant's theory, to convey to the jury that the defendant would go free if found to be insane, to connect the insanity defense with the word "controversial" and, in general, to denigrate the

insanity defense in a manner that invited the jury to engage in nullification, despite the fact that the state had offered no valid evidence in support of its burden to establish that Hanna was sane at the time he killed Gillespie.  It is abundantly clear that in the absence of any actual evidence to rebut the proof of insanity offered by the defense, the prosecutor simply attacked the theory of insanity itself.

*Hanna*, 245 F. App'x at 545.

The *Hanna* panel found support for their approach in *Gall v. Parker*, 231 F.3d 265, 311–316 (6th Cir. 2000).  In *Gall*, as in *Hanna*, the prosecution ignored the record evidence—in some instances, actually misrepresenting that evidence to the jurors—and attacked the insanity defense instead.  That attack included expressions of the prosecutor's personal belief and opinions with regard to Gall's meanness and shrewdness and encouraged the jurors to be skeptical of the psychiatric tests based on the strength of the prosecutor's skepticism of the results.  The prosecutor expressed his personal belief in the credibility of the witnesses based on his personal long-standing knowledge of them.  But that misconduct was simply part of the broader improper strategy of "mak[ing] 'know-nothing appeals to ignorance' rather than present[ing] testimony [to] counter[] the defendant's showing in an evidentiary rigorous way."  *Gall*, 231 F.3d at 314.

The prosecutor did much more than just express personal opinions on issues of credibility:

> In its closing, the Commonwealth used just such highly prejudicial tactics. Rather than attacking Gall's insanity evidence by pointing to counter-evidence that Gall was sane, the Commonwealth simply assaulted the very use of the defense. As he began addressing the issue, the prosecutor compared the insanity defense to other possible defenses.  Other defenses, he emphasized, require "facts," but an insanity defense "is all contained in the skull of the defendant." J.A. at 1579.

>> That is the last line of defense. That is like taking an M1 Rifle and lying in your back yard waiting for the Russians to come. When it is that bad folks, it is all over. . . . Now I want to review this cranial defense within the skull of the Defendant. . . .

> J.A. at 1579–80.  He later reminded the jury not to be "hoodwinked into the defense of insanity," J.A. at 1592.  Further, his comments were peppered with the type of "know-nothing appeals to ignorance" that deprive defendants of their right to a fair consideration of their insanity defense.  For instance, the Commonwealth mocked

Dr. Noelker's use of a "House, Tree, Person Test" to show insanity as opposed to the Commonwealth's evidence of a "smoking gun." J.A. at 1591–92. He asked: "[i]sn't that a convenient time to go into a [schizophrenic state]?" J.A. at 1584. And, similar to the elephant analogy, he analogized Dr. Noelker's description of the long-term evolution of Gall's mental state to a simple hypothetical: "If my wife were pregnant eight years ago and she was pregnant one month now, does that mean she was pregnant in March? That is what Dr. Noelker is telling you." J.A. at 1585. At the same time, the prosecutor minimized the testimony of Drs. Noelker and Toppen that Gall could appear both calm and sane to an "untrained observer" even if examinations and tests revealed that he was insane or severely mentally ill: "He may look sane, but folks, he isn't. Now they are telling us folks, 'you can't look and judge for yourself.'" J.A. at 1581. He then argued to the jury that because Gall appeared intelligent at trial, he must be sane, and must have been sane on April 4. The tone of these statements was similar to the rhetorical approach the prosecutor took in cross-examining Dr. Noelker and Dr. Toppen, in which he assaulted psychology as an inexact discipline where doctors, applying subjective standards "within themselves" can reach polar opposite conclusions in examining the same individual, J.A. at 984–88, 1221–23, and belittled the tests Dr. Noelker had used in diagnosing Gall. J.A. at 1024 ("Now here is a little one here that I think the jury ought to see. This is one of those little psychological tests.").

*Gall*, 231 F.3d at 314–315. But the *Gall* panel was particularly troubled by the prosecutor's disclosure of the "punishment" consequence of an insanity determination:

> Finally, the prosecution's most egregious misconduct was warning that Gall would go free if found not guilty for reason of insanity. During his closing, the prosecution stated: "Now folks are we going to turn [Gall] loose on society by reason of insanity[?]" J.A. at 1588–89. Seconds later, he repeated: Gall "cannot escape the ends of justice by retreating within the safety of his own skull!" J.A. at 1589. At another point, the Commonwealth stated that if the jury were to believe Dr. Toppen's testimony, "then turn him loose." J.A. at 1581. These statements contravened several related rules of conduct. First, they once again detracted from a fair consideration of Gall's insanity defense by introducing the prospect that such a determination would lead inevitably to Gall's release. *See Guidroz v. Lynaugh*, 852 F.2d 832, 837–38 (5th Cir.1988); *United States v. Jackson*, 542 F.2d 403, 411 (7th Cir. 1976); *United States v. Birrell*, 421 F.2d 665, 666–67 (9th Cir.1970); *Evalt v. United States*, 359 F.2d 534, 546 (9th Cir.1966); *United States v. Lane*, 725 F.Supp. 936, 942 (N.D.Ill.1989). Second, the comments violated the cardinal rule that a prosecutor cannot make statements "calculated to incite the passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991); *see Stumbo v. Seabold*, 704 F.2d 910, 912 (6th Cir. 1983) (decrying prosecutorial misconduct which "prejudice[s] and inflame[s] the jury"). Eliciting the image of turning Gall loose on society by finding him insane is perhaps the paradigm example of such impropriety—calling on jurors' emotions and fears rather than "the evidence and law of the case." *United States v. Gainey*, 111 F.3d 834, 836 (11th Cir. 1997).

*Gall*, 231 F.3d at 315.

But, even if Gall's prosecutor's reference to the likely consequence of an insanity determination was the "most egregious misconduct," it is not clear whether, standing alone, it would have been enough to tip the scales:

> In sum, facing Gall's considerable evidence of insanity and EED, counsel for the Commonwealth chose not to rebut that evidence directly. Instead, he expressed his personal belief as to the weakness and partiality of Gall's expert witnesses' testimony, and he mischaracterized crucial aspects of that testimony. He disparaged the very use of an insanity defense as the "last line of defense" and the "M1 Rifle"; he belittled the medical and psychological tools used to support such a defense; and he equated the doctors' testifying about Gall's condition to three blind men "asked to identify an elephant"—"you can imagine the bizarre opinions which they got back." J.A. at 1589. He then pleaded with the jury not to let Gall loose through the insanity defense. In addition to having no doubt that these tactics were improper, we find that they easily satisfy the criteria of "flagrancy" laid out in *Boyle*. They clearly misled the jury and prejudiced Gall's defense of insanity. The comments were not accidental or isolated, permeating the Commonwealth's closing argument as well as other portions of the trial. And they involved the central issue of the case. Moreover, as explained *infra*, the total strength of the evidence rebutting Gall's insanity defense was weak at best, not to mention improperly presented. After a close review of the record, we find that the Commonwealth's misconduct was sufficiently egregious to render the entire trial fundamentally unfair.

*Gall*, 231 F.3d at 315 (footnote omitted).

The Michigan Court of Appeals specifically referenced *Hanna* when it rejected Petitioner's claim of prosecutorial misconduct. The state appellate court distinguished Petitioner's case from Hanna's because Petitioner's prosecutor did not disparage the defense—she simply noted a potential consequence of a finding that Petitioner was not guilty by reason of insanity. Although the court of appeals did not condone that practice, the court did not equate the prosecutor's conduct with the attack on the insanity defense itself that occurred in *Hanna* (and *Gall*).

The state court's conclusion that the prosecutor's comments in Petitioner's case were very different than the prosecutor's comments in Hanna's case is well-supported in the

record.  Reading the entirety of the prosecutor's argument here, it is very clear the prosecutor supported, or at least did not question the legitimacy of, the insanity defense in general.  (Trial Tr. VII, ECF No. 16-16, PageID.1024) ("If he is mentally ill, as defined by the statute, it should be clear.  It should be obvious.  Those are the people entitled to this defense.  Entitled to a walk.  Treatment.  Not punishment.")  Instead, she argued that Petitioner, based on the evidence presented at trial, had failed to show the requisite mental illness or, even if he were mentally ill, that Petitioner had failed to show that he could not appreciate the wrongfulness of his conduct or that he could not conform his conduct to the requirements of the law.

Moreover, Petitioner's reliance on *Hanna* or *Gall* as reflective of clearly established federal law is fraught with peril.  Both cases relied on the Sixth Circuit's "two-step process for determining whether a prosecutor's alleged misconduct violated a defendant's due process rights[.]"  *Hanna*, 245 F. App'x at 544; *see also Gall*, 231 F.3d at 311–312.  The second step of that process, in turn, required evaluation of four factors.  *Hanna*, at 544; *Gall*, at 311–312.  In *Matthews v. Parker*,  651 F.3d 489 (6th Cir. 2011), the Sixth Circuit applied that same analysis to a claim that "[t]he prosecutor . . . denigrated the [extreme emotional disturbance] defense itself . . . ."  *Id*. at 506.  Two members of the *Matthews* panel concluded that using the two-step process and the four-factor test, the prosecutor's comments violated Matthews's due process rights and granted the writ.

In *Parker v. Matthews*, 567 U.S. 37 (2012), the Supreme Court reversed, concluding that the Sixth Circuit was wrong to apply its elaborate two-step analysis including the four-factor test.  The Court held the Sixth Circuit should not have gone beyond the clearly established law of *Darden*: "a prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Parker*, 567 U.S. at 45 (internal quotes omitted).  The Court concluded

that, considered against the appropriate general standard of *Darden*, with the appropriate AEDPA deference, the Kentucky Supreme Court's determination—that the prosecutor's comments that supposedly impermissibly denigrated the EED defense, considered in the context of the entire argument, merely emphasized that the defendant had a motive to exaggerate exculpatory facts— was reasonable. *Parker*, 567 U.S. at 45–48.

The prosecutor's argument in *Parker* was far more objectionable than was the prosecutor's argument in Petitioner's case. Indeed, the *Parker* argument was more in line with the argument offered in *Hanna* and *Gall*. Nonetheless, application of the more general standard of *Darden* and appropriate AEDPA deference compelled the result that Matthews's due process rights had not been violated. The undersigned concludes that application of the general standard of *Darden*—which allows the state court more leeway in resolving such claims—combined with appropriate AEDPA deference, supports reaching the same result here. The prosecutor's reference to the consequence of the jury's finding that Petitioner was not guilty by reason of insanity did not violate Petitioner's due process rights. Under the circumstances in Petitioner's case, the argument did not appear to be intended to incite passion or prejudice, nor did it denigrate the insanity defense in any way. This is not a circumstance where the contested argument undermined the fundamental fairness of Petitioner's trial.

That conclusion is bolstered by the fact that when the prosecutor argued that Petitioner could go free if found not guilty by reason of insanity, it was likely not a novel proposition for the jurors. To the extent the jurors were not clued in as to the likely penalty by the "not guilty" preface of "not guilty by reason of insanity," the instructions certainly supported the conclusion that if the jurors found Petitioner not guilty by reason of insanity that their finding would excuse his behavior. (Trial Tr. VIII, ECF No. 16-17, PageID.1136) ("The law excuses a person who is legally insane at the time of a crime . . . ."). And the "not guilty by reason of

insanity" verdict stands in contrast to the potential verdict of "guilty but mentally ill."  It seems somewhat naïve to conclude a trial is rendered fundamentally unfair by a prosecutor's argument informing the jurors that a not guilty verdict could mean no punishment or a guilty verdict could mean there is punishment, when the verdicts themselves suggest that result.

That conclusion is also influenced by the curative instruction given by the trial court.  Petitioner's counsel objected to the prosecutor's argument.  He asked the trial court to instruct the jurors with more detail regarding what might happen if Petitioner were found not guilty by reason of insanity, i.e., "some explanation that the defendant doesn't skate, he's not released, and that there is . . . hospitalization or some other term of commitment which the United States Supreme Court has held is a form of punitive consequence."  (Trial Tr. VIII, ECF No. 16-17, PageID.1116.)  The trial judge reviewed the development of the law in Michigan regarding the appropriate instruction to give regarding potential consequences where a defendant raises the defense of not guilty by reason of insanity.  (*Id*., PageID.1118–1121.)  The court concluded that state law did not allow delving into the potential consequences of that verdict because there were so many possible contingencies.  (*Id*., PageID.1120.)  Nonetheless, the court agreed to provide a "beefed up" version of the instruction telling the jury "that it's not to consider the consequences of its verdict . . . ."  (*Id*.)  And the court did:

> Possible penalties should not influence your decision, it is the duty of the judge to fix the penalty within the limits provided by law.

(*Id*., PageID.1129.)  Additionally, the court instructed the jurors that "[t]he lawyers' statements and arguments are not evidence . . . ." (*Id*., PageID.1125.)

The Sixth Circuit has concluded that comments similar to those made by the prosecutor here, even if they might incite passion or prejudice, can be cured with proper instructions.  *See, e.g. Smith v. Jones*, 326 F. App'x 324, 328–329 (6th Cir. 2009) (where Petitioner, a police officer, was convicted of criminal sexual conduct committed against a woman in his police

car, while on duty, and prosecutor argued "returning a not-guilty verdict would be akin to saying 'I'd be okay with having my daughter stopped by [Smith] at three in the morning," an instruction that lawyers' statements and arguments are not evidence sufficed to prevent confusion or improper influence); *Beuke v. Houk*, 537 F.3d 618, 649–650 (6th Cir. 2008) (prosecutor's closing argument appeal to the jurors' fears that Bueke would commit additional crimes if he was eventually released from prison was improper, but isolated, and did not violate due process where court gave cautionary instruction that arguments of counsel were not evidence); *Johnson v. Bell*, 525 F.3d 466, 484–485 (6th Cir. 2008) (prosecutor's improper invitation to identify themselves or their children with the child victim did not render trial fundamentally unfair where curative instruction regarding arguments of counsel was given).

The jury was clearly instructed it could not consider the penalty when it reached its verdict.  "A jury is presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).[4]  Indeed, for that reason, the court of appeals concluded that even if the prosecutor's argument constituted plain error, that error did not prejudice Petitioner.  (Mich. Ct. App. Op., ECF No. 16-19, PageID.1209.)  Petitioner has failed to show that the appellate court's analysis—first that the argument did not violate Petitioner's due process rights, and second that the argument did not prejudice Petitioner in light of the instructions—is contrary to, or an unreasonable application of, *Darden*.  Accordingly, he is not entitled to habeas relief on this claim.

## 2.   Foot fetishists, child pornographers, and serial fire-setters

The court of appeals concluded the prosecutor was not engaged in misconduct when she raised this argument:

---

[4] That the jury found Petitioner "guilty" instead of "guilty but mentally ill" also supports the inference that the jury was not swayed by the prosecutor's disclosure of the potential consequence a "not guilty by reason of insanity" verdict. If, in fact, the jury had concluded that Petitioner was legally insane when he committed the crimes, but could not bear setting him free, the "guilty but mentally ill" verdict would appear to be the next logical choice, not a "guilty" verdict.

"A prosecutor may not make a statement of fact to the jury that is not supported by evidence presented at trial and may not argue the effect of testimony that was not entered into evidence." *Unger*, 278 Mich App at 241.  The prosecutor did not make any statement of fact regarding the fires that was not supported by evidence presented at trial.  Rather, using persons with foot fetishes and those who enjoy child pornography as examples, the prosecutor argued that a person is not insane merely because the person engages in weird, different, or odd behavior.  The prosecutor's argument was not a "foul" blow.  *Berger*, 295 US at 88.  It was undisputed that defendant engaged in weird or odd behavior.  He set garages on fire because it allowed him to feel in control.  The prosecutor's statement was part of a larger argument that, even though he got enjoyment from setting fires, defendant was not insane, as defined by the law, because he was "living a normal life."  When read in context, the prosecutor's statement was not plainly erroneous.  *Ackerman*, 257 Mich App at 448.

(Mich. Ct. App. Op., ECF No. 16-19, PageID.1209.)

Unflattering comparisons in closing argument are common.  Nonetheless, some comparisons cross the line.  For example, comparing an accused to Hitler or Pontius Pilate or Judas Iscariot might be considered a "foul blow" under *Berger*.  *See, e.g., Martin v. Parker*, 11 F.3d 613, 616 (6th Cir. 1993); *United States v. Steinkoetter*, 633 F.2d 719, 720–21 (6th Cir. 1980).  Yet even those extreme comparisons are not necessarily unconstitutional.  *See, e.g., Farmer v. Hofbauer*, 1 F. App'x 372, 381 (6th Cir. 2001) ("The prosecutor's single reference to Hitler, moreover, was not so egregious as to render Farmer's trial fundamentally unfair.  Looked at in context, the reference seems designed only to point out that an entire country and its leader can have delusions, and yet not be considered legally insane."); *Fussell v. Morris*, No. 88-4105, 1989 WL 100857, at *4 (6th Cir. Sep. 1, 1989) ("The prosecutor's brief reference in closing argument to a comparison between petitioner and Hitler was improper and we do not wish to be viewed as countenancing this kind of prosecutorial conduct.  We believe it had only a slight tendency, however, to mislead or divert the jury from the real issues.  Remarks about the victims' terror and the effect on their family did shift the focus from the question of petitioner's guilt, but others were relatively isolated.  The comparison to Hitler was made in conjunction with the evidence which indicated that petitioner had little compunction about lying to evade responsibility for his actions."); *Allen v.*

*Woodford*, 395 F.3d 979, 1016 (9th Cir. 2005) ("We agree with Allen that the prosecutor's comparison of him to Adolf Hitler was improper.  Again, however, this reference did not render the penalty phase unfair. . . . [T]o suspect that the reference to Hitler swayed the jury on a close and critical issue would underestimate the common sense that we properly attribute to the jury.") (footnote, internal quotes, and citation omitted).

Similarly, a reference to child pornographers in an argument about Petitioner's guilt runs the risk that the passion and prejudice individuals reserve for child pornographers might be introduced and directed at Petitioner.  Given the nature of the argument here, however, that risk seems slight.  The prosecutor was illustrating the point that simply because the jurors might not understand the thrill another person gets from a foot, or child pornography, or setting a fire, does not mean that the other person is insane.  The prosecutor was ***not*** arguing a moral equivalence between fire-setters and child pornographers, nor was she directly comparing Petitioner to a child pornographer.  The comments were isolated to a single paragraph in an argument that went on for pages.  The state appellate court's conclusion that this reference, though not without risk, did not render Petitioner's trial fundamentally unfair, was neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### D.      Improper opening argument (habeas ground IV)

In his motion for relief from judgment, Petitioner expanded his prosecutorial misconduct claim to include the opening argument.  During the prosecutor's opening argument she tracked through all of the fires Petitioner had set, she recounted what she expected the evidence would show with regard to the fires, Petitioner's involvement, an anonymous tip, the investigation, the apprehension of Petitioner, and his recorded interview.  At the end of the argument she stated:

> After you hear all of the evidence in this case, I'm going to ask you to come back with a fair verdict.  Once the defendant has had his day in court, his fair trial, I'm

going to ask you to come back with a fair verdict, the just verdict, and that is guilty of all counts, arson and home invasion, for the destruction and the terror that he caused Kent County residents in 2010.

(Trial Tr. I, ECF No. 16-10, PageID.370.)  It is the last sentence that Petitioner finds objectionable.

He contends that it is an impermissible "civic duty" argument.

> The trial court disagreed:
>
> Defendant states that the prosecutor asked the jury to find him guilty on all counts "for the destruction and terror that he caused Kent County residences [sic] in 2010."  Presumably, Defendant believes this to be a civic duty argument, but offers no further explanation.  [P]rosecutors should not resort to civic duty arguments that appeal to the fears and prejudices of jury members or express their personal opinion of a defendant's guilt, and must refrain from denigrating a defendant with intemperate and prejudicial remarks.  *People v Bahoda*, 448 Mich 261, 282-83 (1995).  Without any argument or authority from Defendant, this Court is not persuaded that the prosecutor was arguing anything other than that the jury should convict based on the evidence produced at trial.  Defendant's Issue One is without merit.

(Kent Cnty. Cir. Ct. Order, ECF No. 16-22, PageID.1537.)

Petitioner's claim that the prosecutor's final sentence presents a "civic duty" argument begs the question:  what is a "civic duty" argument?  There is no clearly established federal law on that point.  The Supreme Court has frequently referenced jury service as a "civic duty," *see, e.g., Dietz v. Bouldin*, 136 S. Ct. 1885, 1896 (2016) ("Juries are of course an integral and special part of the American system of civil justice. Our system cannot function without the dedication of citizens coming together to perform their civic duty and resolve disputes"); but the Court has never defined, or even commented on, "civic duty" arguments.

Although the Court has not mentioned "civic duty" arguments, it has commented on the dangers of prosecutorial argument that is "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." *Viereck v. United States*, 318 U.S. 236, 247 (1943).  The prosecutor's challenged argument in *Viereck* was as follows:

32

In closing, let me remind you, ladies and gentlemen, that this is war.  This is war, harsh, cruel, murderous war.  There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

This is war.  It is a fight to the death.  The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else.  They are relying upon you ladies and gentlemen for their protection.  We are at war.  You have a duty to perform here.

As a representative of your Government I am calling upon every one of you to do your duty.

*Id*. n. 3.  The *Viereck* Court went on to heartily condemn that argument:

At a time when passion and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury where highly prejudicial, and that they were offensive to the dignity and good order with which all proceedings in court should be conducted.  We think that the trial judge should have stopped counsel's discourse without waiting for an objection.  "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor—indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78, 88 [(1935)].

*Id*. at 248.  Although the *Viereck* Court's statement may be stirring, and though it could provide the foundation for a "civic duty" argument proscription, it is entirely dicta.  The Court specifically acknowledged that the "duty" argument was not the error that prompted reversal, but was simply another issue that "might well have placed the judgment of conviction in jeopardy."  *Id*. at 247.  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams*, 529 U.S. at 412; *Bailey,* 271 F.3d at 655.

In the same way that labeling a confessor "mentally ill" does not render the confession involuntary, labeling an argument a "civic duty" argument does not render that argument prosecutorial misconduct.  The determination of impropriety requires going deeper.  For the confession, the deeper inquiry is whether the confession was coerced.  Mental illness might be relevant to the analysis, but it is not dispositive.  For the "civic duty" argument, the deeper inquiry is whether the argument is irrelevant such that its only purpose would be to arouse passion and prejudice.  The fact that the argument invites the jurors to satisfy a civic duty is relevant to that analysis, but it is not dispositive.

In *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991), the Sixth Circuit Court of Appeals considered exactly how the "civic duty" analysis fits within the more fundamental inquiry into whether the prosecutor has attempted to appeal to the jurors' passion or prejudice:

> Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not *per se* impermissible.  *See Henderson v. United States*, 218 F.2d 14, 19–20 (6th Cir.), *cert. denied*, 349 U.S. 920 (1955).[2]  Our determination of whether comments are calculated to incite prejudice and passion in the jury is informed by the Supreme Court opinion in *Viereck*.
>
> *       *       *
>
> The remarks in the instant case are analogous to the comments adjudged inflammatory and prejudicial in *Viereck*.  The fairness or unfairness of comments appealing to the national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers.  The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice.  The Supreme Court in *Viereck* framed the inquiry to incorporate both the purpose and effect of the comments.    In that case, in the light of contemporaneous events, which had great impact on the emotions and perceptions of jurors, the remarks "could only have . . . arouse[d] passion and prejudice."  *See id.* at 247.

---

[2] Our holding in *Henderson* and the result reached in *Alloway* reflect a general rule followed by other circuits as well.  In *United States v. Shirley*, 435 F.2d 1076 (7th Cir. 1970), the Seventh Circuit stated that the prosecutor's closing remarks concerning the increasing number of cars being stolen

did not overstep the bounds of fairness and propriety and could not have worked a substantial injury to the defendant in denying him a fair trial because, even though the statements were not particularly relevant and had no bearing on the guilt or innocence of the defendant, the remarks did not contain an emotional appeal to the jurors' self-interest designed to arouse their prejudice against the defendant. *Id.* at 1079.

The Eighth Circuit has also stated, in a case where the prosecutor told the jurors that they were the public's last shield and the district court instructed the jury to disregard the remark, that unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible. *United States v. Lewis*, 547 F.2d 1030, 1036 (8th Cir.), *cert. denied*, 429 U.S. 1111 (1976). Similarly, the Eleventh Circuit, in *United States v. Kopituk*, 690 F.2d 1289, 1342–43 (11th Cir.1982), *cert. denied*, 463 U.S. 1209 (1983), stated that appeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not *per se* impermissible. However, the remarks complained of in *Kopituk* were found by the court to have approached the line demarcating impermissible comment calculated to incite the jury against the accused, but not to have crossed the line into the realm of impropriety and prejudice by directly suggesting that the jurors had personal stakes in the outcome of the case.

*Solivan*, 937 F.2d at 1151–52. The *Solivan* court went on to review several decisions where circuit courts of appeal had concluded that the argument crossed the line. For example in *United States v. Barker*, 553 F.2d 1013, 1024–25 (6th Cir. 1977), the court concluded that it was improper "for a prosecutor to suggest that unless the defendant was convicted it would be impossible to maintain 'law and order' in the jurors' community." *Solivan*, 937 F.2d at 1152. Additionally, the *Solivan* court referenced several cases where prosecutor's had gone too far in suggesting that their role as jurors permitted them to do something about drug trafficking in their community. *Solivan*, 937 F.2d at 1152–53.

The *Solivan* court contrasted those cases—cases where the jury was asked to look beyond the evidence against a particular defendant and consider the impact of their verdict on societal problems generally—with the decision in *United States v. Alloway*, 397 F.2d 105 (6th Cir. 1968). In *Alloway*, the court considered the propriety of the following argument:

You, the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be tolerated, that we're not going to tolerate [armed robbery]. . . .

*Alloway*, 397 F.2d at 113. The *Solivan* court explained why the "conscience of the community" argument in *Alloway* was acceptable while similar argument in *Barker* and *Solivan* was not:

35

The comments by the prosecutor in *Alloway* and the comments complained of in the instant case are only vaguely similar. The remarks in this case appear to us to have been deliberately injected into the proceedings to incite the jury against defendant.  Given the nature of this case, involving a cocaine transaction, and the wider social context which the prosecutor sought to bring to bear on the proceedings, the national drug problem, the purpose and effect of the comments could have only been to arouse passion and prejudice.  *See Viereck*, 318 U.S. at 247.  We determined that the statements made in *Alloway* were not deliberately injected into the proceedings to inflame the jury.  *See* 397 F.2d at 113.  Indeed, examined in the light of the nature of the case and the wider social context in which the case was prosecuted, it is clear that the government's statements in *Alloway* were devoid of the sort of inflammatory content inherent in the prosecutor's statements in this case precisely because there was no comparable specific wider context of national attention and concern present in *Alloway* pertaining to armed robbery.  The comments in *Alloway* did not attempt to compare or to associate the defendant with a feared and highly publicized group, such as drug dealers, as did the prosecutor in this case.  The prosecutor in *Alloway* did not go beyond a mere allusion to the general need to convict guilty people, as did the prosecutor in this case, and bring to bear upon the jury's deliberations the attendant social consequences of defendant's criminal conduct or urge the jury to convict an individual defendant in an effort to ameliorate society's woes.

\*    \*    \*

In *Alloway*, we were presented with remarks by the prosecutor which alluded only to the general criminality of the defendant's conduct in robbing the bank and the general community need to convict guilty people.   The comments at issue in *Alloway* constituted a general plea which did not even specifically refer to the crime of armed robbery.  Moreover, armed robbery was not and is not the specific focus of national attention as is the drug problem.   In the instant case, we find that *Alloway* is inapposite because, in this case, the prosecutor went beyond the scope of the prosecutor's statements in *Alloway*, which constituted a mere innocuous reference to the community or societal need to convict guilty people.

*Solivan*, 937 F.2d at 1154–55.[5]  Neither *Solivan* nor *Alloway* are of particularly recent vintage, but just a few months ago, the Sixth Circuit relied on the analysis in *Solivan* and described it as "one of the most cited cases in this circuit regarding attorney appeals to the community conscience . . . ." *United States v. Hall*, 979 F.3d 1107, 1122 (6th Cir. 2020).

---

[5] The *Solivan* court also noted that "[t]he district court in *Alloway* subsequently instructed the jury to base its verdict solely on the evidence and to consider the prosecutor's argument only as it corresponded with the evidence." *Solivan*, 937 F.2d at 1154.  But separate and apart from the remedial instruction, the Sixth Circuit concluded that the argument was not prosecutorial misconduct because it was not, by purpose or effect, intended to inflame the passion and prejudice of the jury.

Considered against the backdrop of the prosecutorial arguments in *Solivan* and *Alloway*, the prosecutor's opening argument in Petitioner's case is like the permissible *Alloway* argument, not the impermissible *Solivan* argument.  The prosecutor argued:

> After you hear all of the evidence in this case, I'm going to ask you to come back with a fair verdict.  Once the defendant has had his day in court, his fair trial, I'm going to ask you to come back with a fair verdict, the just verdict, and that is guilty of all counts, arson and home invasion, for the destruction and the terror that he caused Kent County residents in 2010.

(Trial Tr. I, ECF No. 16-10, PageID.370.)  The reference to "destruction" and "terror" is not directed to a national, regional, or even local scourge of arson crimes, it is directed to the 11 fires that Petitioner set according to the evidence and the 5 specific arsons with which he was charged. The prosecutor was not calling upon the jurors to look outside of the specific actions for which Petitioner was being tried to address a larger societal problem, she was asking the jurors to look at the evidence regarding Petitioner's fire-setting and find Petitioner guilty.  That Petitioner's fires caused destruction and terror was part of the evidence presented during his trial.  There is nothing in the prosecutor's argument to suggest that by purpose or effect she was trying to inflame the passion and prejudice of the jury beyond whatever passion and prejudice might follow from the evidence that Petitioner committed the charged crimes.

Petitioner's suggestion that appealing to the jurors "civic duty" is *per se* prosecutorial misconduct is plainly wrong.  The prosecutor's argument here must be measured against the more general proscription against arguments intended to inflame passion and prejudice to the exclusion of proper consideration of the evidence.  Such a general proscription leaves state courts a lot of leeway in resolving constitutional claims.  Petitioner has failed to show that the state court's conclusion that the prosecutor's opening argument was proper is contrary to, or an unreasonable application of, clearly established federal law.  Moreover, the argument here falls

well within the bounds of permissible argument as established by Sixth Circuit authority. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### E.    Judge-found facts (habeas ground V)

Petitioner next complains that his sentence violates his Sixth Amendment right to trial by jury because it is based on facts found by the judge and not decided by the jury or admitted by Petitioner.  Petitioner bases his Sixth Amendment claim on a line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and including *Ring v. Arizona*, 53 U.S. 584 (2002), *Blakely v. Washington*, 542 U.S. 296 (2004), *United States v. Booker*, 543 U.S. 220 (2005), and *Alleyne v. United States*, 570 U.S. 99 (2013).  In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence.  In the subsequent case of *Blakely*, the Court applied the rule of *Apprendi* to a state sentencing-guideline scheme, under which the maximum penalty could be increased by judicial fact-finding. The *Blakely* Court held that the state guideline scheme violated the Sixth and Fourteenth Amendments, reiterating the rule that any fact that increases the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt."  *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

Thereafter, in *Alleyne*, 570 U.S. 99, the Supreme Court held that the *Blakely* line of cases applies equally to mandatory minimum sentences.  In *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), the Michigan Supreme Court held that, under *Alleyne*, the Michigan sentencing guidelines scheme violates the Sixth Amendment, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables [] that *mandatorily* increase the floor of the guidelines minimum sentence range."  *Lockridge*, 870

N.W.2d at 506 (emphasis in original).  The Court's remedy for the unconstitutionality of the Michigan guidelines was to sever and strike the mandatory component of the guidelines and make the guidelines advisory only.  *Id.* at 520-21 (relying on *Booker,* 543 U.S. at 264-265 (holding that the remedy for the unconstitutionality of the mandatory federal sentencing guidelines was to sever only the mandatory component, still requiring courts to consider the guidelines, but making them advisory and subject to review for reasonableness)).

On August 24, 2018, the Sixth Circuit agreed with the *Lockridge* analysis. *Robinson v. Woods*, 901 F.3d 710 (6th Cir. 2018).  The *Robinson* court held that the Supreme Court's decision in *Alleyne* clearly established that Michigan's mandatory minimum sentencing scheme was unconstitutional.  *Robinson*, 901 F.3d at 714.  The court reasoned that, "[]a]t bottom, Michigan's sentencing regime violated *Alleyne*'s prohibition on the use of judge-found facts to increase mandatory minimum sentences.  *Id.* at 716 (citing *Alleyne*, 570 U.S. at 111-12).

In the instant case, Petitioner was sentenced on December 13, 2011, before *Alleyne* was decided.  The *Alleyne* court was not writing on a blank slate.  More than 10 years earlier, the Supreme Court held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment.  *Harris v. United States*, 536 U.S. 545 (2002). Relying on *Harris*, as well as *Apprendi*, *Booker*, and *Blakely*, the Michigan Supreme Court concluded that any guidelines sentence, even one based on facts and circumstances not proven to a jury beyond a reasonable doubt, was permissible under the Sixth Amendment, so long as it did not exceed the statutory maximum.  *People v. Drohan*, 715 N.W.2d 778, 784–87 (2006).  That was the state of the law when Petitioner was sentenced and when Petitioner filed his briefs in the Michigan Court of Appeals.  Between the completion of the appeal briefs and oral argument, the Supreme Court decided *Alleyne*.

Perhaps Petitioner could have raised the issue as a supplement before the court of appeals decided his case, but the effort would have likely been futile.  That was the approach taken by criminal defendant Paul Herron.  Herron's appeal was pending at the same time as Petitioner's. Herron filed a supplemental brief raising the *Alleyne* issue.  *See*  https://courts. michigan.gov/opinions_orders/case_search/pages/default.aspx?SearchType=1&CaseNumber=30 9320&CourtType_CaseNumber=2 (visited Feb. 13, 2021).  The *Herron* court of appeals panel concluded that *Alleyne* did not apply to Michigan's sentencing guidelines which impacted only the minimum end of an indeterminate sentence and was entirely discretionary.  *People v. Herron*, 845 N.W.2d 533 (Mich. Ct. App. 2013).  Perhaps because of that decision, Petitioner chose not to supplement his briefs or include the *Alleyne* issue in his oral arguments in the court of appeals or in his application for leave to appeal to the Michigan Supreme Court.

*Lockridge* was decided during the summer of 2015, after the Michigan Supreme Court denied leave to appeal in Petitioner's direct appeal.  Therefore, Petitioner's judgment was final before the Michigan Supreme Court decided *Lockridge* and the *Lockridge* decision did not apply to him directly and afford him a remedy.  *People v. Richards*, 891 N.W.2d 911, 924 (Mich. Ct. App. 2016) *rev'd, in part, on other grounds* 903 N.W.2d 555 (Mich. 2017) (court held that *Lockridge* applies retroactively to cases pending on direct review when *Lockridge* was issued on July 29, 2015).  But *Lockridge* overruled *Drohan*, opening the door to application of *Alleyne* to Michigan sentencing guidelines minimums.  Thus, Petitioner was still free to argue that *Alleyne* rendered judicial fact-finding in support of scoring the sentencing guidelines unconstitutional in his case.  And *Alleyne* applied to Petitioner because his case was still pending on direct review when the *Alleyne* opinion was issued.  *Robinson*, 901 F.3d at 714–15 ("And Supreme Court opinions apply to all criminal cases pending on direct review, no matter how much of a departure

the decision represents from prior caselaw.") (citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)).

In Petitioner's case, however, the proscription against using judge-found facts to dictate a mandatory minimum guidelines range is immaterial because the trial court did not sentence Petitioner based on a mandatory minimum guidelines range—the court departed upward from that range.  From the inception of this line of authority in *Apprendi* to its most recent refinement in *Alleyne*, the United States Supreme Court has never suggested that judicial fact-finding in support of the court's exercise of discretion, as happened here when the court departed upward from the minimum range established by the guidelines, violates the Sixth Amendment. *See Booker*, 543 U.S. at 232 ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment.  We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."); *see also Apprendi*, 530 U.S. at 481–82 (reiterating that "'a sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review'") (emphasis added) (quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972)); *see also Reign v. Gidley*, 929 F.3d 777, 781 (6th Cir. 2019) ("But the constitutional error here was the mandatory application of the guidelines, not merely the consideration of judge-found facts.").  Petitioner's *Alleyne* claim is meritless whether the guidelines were mandatory or discretionary because the trial court sentenced Petitioner outside the guidelines.

### F.    Trial counsel's failure to object to the prosecutor's opening argument (habeas ground VI)

Petitioner claims that trial counsel's failure to object to the prosecutor's "destruction and terror" comment during opening argument rose to the level of ineffective assistance of counsel.  For the reasons set forth in § II. D., the "destruction and terror" comment

was not objectionable.  Accordingly, the objection Petitioner's urges would have been meritless and, therefore, futile.  Counsel's failure to raise a meritless issue does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d at 523.  "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### G.    Appellate counsel's failure to raise material issues (habeas ground VII)

Finally, Petitioner complains that his appellate counsel rendered ineffective assistance because counsel failed to raise the challenges regarding the prosecutor's opening argument at trial and violation of the Sixth Amendment per *Alleyne* at sentencing.  The *Strickland* standard applies to claims of ineffective assistance of appellate counsel; but the nature of effective appellate advocacy shifts the boundaries of professionally reasonable conduct.

An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689.  As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 287-88 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 288.

Petitioner cannot show that the issues appellate counsel chose to forego were stronger than the appellate claims raised.  As set forth in detail above, Petitioner's prosecutorial

misconduct claim relating to opening argument and his *Alleyne* claim lack merit.  *See* §§ II.D. and II.E. above.  Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal.  *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781–82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal).  Therefore, Petitioner is not entitled to habeas relief on this claim.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong with regard to Petitioner's habeas grounds I, II, IV, V, VI, and VII. Therefore, I recommend that the Court deny Petitioner a certificate of appealability with regard to each of those issues. With regard to habeas ground III, which challenges the prosecutor's reference to "skating" by means of a determination of insanity and her comparison of setting fires to sexually aberrant behavior, I believe that reasonable jurists could reach a different conclusion. My recommendation to deny that claim is premised on where those isolated comments fit into the argument as a whole and there may be room for disagreement on that point. Accordingly, I recommend that the Court grant a certificate of appealability with regard to habeas ground III.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, with regard to all but one issue, I would not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied with regard to habeas grounds I, II, IV, V, VI, and VII, but granted with regard to habeas ground III. Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Dated:  February 19, 2021                          /s/ Ray Kent
                                                     Ray Kent
                                                     United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).